INTEGRATED TECHNOLOGY v. RUDOLPH Mr. McDonald. Good morning, Your Honor. May it please the Court. This case presents one core issue. Is ITC a stop as a matter of law from asserting the doctrine of equivalence against Rudolph's probe works and its redesigned PRVX products? To obtain its patent, ITC gave up claims scope that would have literally covered those two products. They amended their claim to require that an image of the probe tip be captured in the first state where the probe tip is driven into contact with a window with the first force. That added first state limitation was the only element disputed at trial. The jury found in Rudolph's favor that those two products did not literally infringe that added element. They found infringement only under the doctrine of equivalence. And the Court adopted those findings. Those two systems obtained the digital image using a first state where that probe tip does not contact the window at all. And it's certainly not driven into contact with the window with the force. The Court would probably have read your briefs. But why isn't this within some of the exceptions to prosecution history estoppel set forth in festo? Sure. I'll get right to that. It appeared that ITC primarily relied on the tangentiality exception. So I'll go to that first. They bear the burden of proof on all these exceptions. They're all resolved as a matter of law. And tangentiality in particular is based on the prosecution history objective record. They did not meet their burden here. They say in effect that the reason for their amendment was to... Is there any major evidence by which the patentee has to make a showing of tangentiality or foreseeability? I mean, is it by clear and convincing evidence? I know it's a legal issue. But are we just allowed to make the factual findings ourselves? Well, I haven't seen anything that goes beyond they have the burden of proof. So I don't assume it's a higher burden than preponderance of the evidence. But it is on the objective record. So I think it's a question of law. I just ask because I can't find a case from this Court in which we have said, have defined the major proof by which the patentee has to perform in order to succeed to convince us that are legal inquiry. Well, right. And I think maybe part of that is because it is addressed as a question of law and discussed that way. So burden of proof doesn't necessarily come up in that context. But it is looking at the objective record here. So that does make it very much a question of law that's appropriate for de novo review by this Court. Why isn't the rationale of the amendment here tangential to the no-touch approval? Well, the reason ITC put forth is, well, we only really needed to say... Well, right. I'd like to address... Well, the reason for the amendment, there were two reasons for the amendment that directly relate to the equivalent. One was there was a 112 indefinite rejection of the claim. It was, according to the examiner, replete with ambiguities. But also, specifically to this issue, the examiner said the claim is not clear as to exactly what images are being analyzed. And in response to that rejection, ITC added this first state image being driven in contact with a forced language and said that that amendment, all the amendments they were making, certainly including that one, addressed the general and specific comments of the examiner on 112 and overcame them. So this specific language, it wasn't just an image. It had to be, tell me what the images are. And so by saying, okay, this is an image of the tip when it's actually driven in contact with a force in both the first and second states. They had directly addressed that 112 rejection using the exact language at issue here, number one. But the image can be taken from an infinitesimally close distance to touching, correct? Well... We know it can because that's what... Right, that's what our non-infringing or non-literal infringing version is. That's right. And so they chose not to include that. They could have come up with a way to describe exactly what image was being captured by including that as well, but they chose not to. Did they choose not to include that, or would they say that they were doing something that had never been done before, detecting the entire footprint, not just detecting alignment of these probes? Well, at the time they made that amendment, they also had to address a 102 rejection for the SATO reference. They did refer to SATO being what they called... The test device, which wasn't testing the tester, it was testing the probes themselves, the chips themselves. So there are a number of distinctions. Couldn't they argue that, well, SATO was something very tangential to what our amendment had to do? The record itself, though, shows that they referred to SATO as being what they called a non-overdriven state. So that's certainly the objective record would indicate they are not just talking about images, but they're driven in contact with the force language, number one. Number two, there's a later rejection under 103 for a combination of references where the examiner specifically said it was obvious to take one image and compare it to data such as from a second image. And then the examiner combined it with other art to say that. Moreover, in the combination with other art would indicate this is a way to predict a scrub. Was that in the original prosecution? Yeah, that was in the original prosecution in 1999, I believe is the date of that, before the patent originally issued. And in response to that, ITC relied very heavily on this driven in contact with the force language. And that's where they really drove into the issue of, in our embodiment, it's not just two images, examiner. It is two images both after initial contact, both states requiring it being driven. In fact, they both face the words after initial contact. Does your non-contact redesign add anything to this technology? Or is it really just the work of what Grover Tank would say is an unscrupulous copyist? Absolutely not an unscrupulous copyist. In fact, what had happened is that our client had independently developed the product in the first place. Even the original PRVX was designed to not touch in that first state because they thought it was a better way to do things. The reason being, if you touch in that first state, because there are some variances, that tip might move a little bit. They wanted more repeatability of results by knowing exactly where that tip was in the first state. So they didn't want to touch. Now when they went back and tested it out after they got sued, they found out due to tolerance… Isn't the image taken when it's touching? Isn't the image taken the instant that the touching occurs? No, not in our device. No, no, no. If you were actually going to touch. You say there's some benefit in taking the image to not touching because if you touch it might move. So my question is if the image is taken at the instant of the touching, then you don't care if it moves. Well, but if you can assure that that's going to happen every time, that's true. But the problem is there are tolerances. And that was our original design to try to come up right to the edge. But sometimes it was driven into contact and sometimes it wasn't. That's why we redesigned it to move that window back a few miles. Further on the question of the chief judge about what the benefits were here because at least in your case, you didn't know whether you were touching or non-touching. Sometimes you were touching, sometimes you weren't. Because the tolerances are so tight. Right, but the intent originally was to not touch. And that's why they redesigned to ensure that. And their testimony was that that did have benefits of repeatability of measurements because there wouldn't be that variation if you deflected a little bit or a little bit more. Those few microns could make a difference. That also would enable. And you went for that design originally because you knew that if you were touching for the first image, you would be infringing. No, we weren't even aware of the patent at the time. You weren't aware? That was designed in 93. The amendment, by the way, happened in 95. That 93 original product. Let's say, when did you, what's the record show when you first became aware of the patent? When we got sued in 2006. The jury finds you willful. That's right. With respect to these equivalents, not the original design, but the two equivalents. Obviously, they thought that the design was an insubstantial change or, you know, we walked into the trial having already been found to infringe with their original product. It was a tough situation for us. Would you like to save your rebuttal time, Mr. McDonald? Yes, yes. Thank you. Andrew? May it please the Court. Rudolph's whole case, at least on appeal, is based on ignoring every single thing that happened down below. They ignore the testimony. They ignore what happened before the trial. They ignore the judge's orders. Okay, counsel, stop with the rhetoric. Don't do that. So, the last thing we talked about, that the Court's talked about, a little bit had to do with the tangentialness exception. Well, tangentialness exception… Now, the district court actually says this wasn't a narrowing amendment. Correct. Would you defend that position? Well, I think the Court, the reason the Court found it wasn't a narrowing amendment is all their witnesses testified, we do exactly that. When they look at the amendment, all of the witnesses from Rudolph say that's exactly what we do. The purpose of the amendment, according to the prosecution history, was to incorporate what was in 6A through 6C, the images. 6A says there is, the image is taken at no over-travel, zero mils over-travel, where there is no deflection. All their witnesses say that's exactly what we do through no touch. So, what I think the Court believed was it didn't matter because they admit that they do exactly what that element is. So, by just reading in, by saying you have to take a first state and a second state, didn't really affect anything because the definition of scrub always, at least at that time, incorporated getting an image or doing something where you initially touch and at the point of over-travel. Did the first claim have a first source, a first force and a second force? I didn't see that in original claim 6. No, it did not. Admittedly, it did not. Clearly, it is a narrowing amendment. To that extent, yes, I will agree with that, Your Honor. But that amendment had nothing to do, of course, with Rudolph's equivalence, their no-touch equivalent. Because none of the prior art taught taking two images. The Sato reference didn't take two images. The Mattiatt reference didn't take two images. The Fredrickson reference didn't take two images. Even their experts admit that. My question is how you're taking the images. The images were taken according to the amendment made to get the image we saw in Figure 6A. Doesn't the file history reflect how it is the patentee felt the images should be taken? In the first instance, you take it after contact? No. I'm looking at the file history of JA10656. The patent talks, or the file history talks about ways that you can take it and the ways that it's done in general. Have you got the record with you? Yeah, of course. Why don't you look at JA10656. And this is where you are traversing the 102 rejection. I'm just talking about whether how the images created was being discussed was involved in the file history. If you look there in the middle of the page, more particularly, Claim 6 is amended. Calls for viewing the system to obtain a digital image. Probe tip is driven in contact with the window. Correct. The probe tip, in order to come in contact with the window, it of course has to be driven towards the window. Because the way these things work is you've got a window, you have a probe hanging down, and you've got to either drive the pin down or move the plate up. So it's got to be driven at least towards that point of contact. We're talking about what the rationale for the amendment was. The amendment was to create a means to take both the first and the second image. Well, the rationale is to take two images. The way that the end of that paragraph says... In the light of what I showed you, can you honestly say that the question of how you took the images is irrelevant? I can say that what the... Yes, I guess I can. Because the key to the invention is to get the first image and the second image. The first image being exactly that point where it would touch. Because that's the definition of scrub. But it's in contact. Yes. It's not driven to a point that is roughly in contact. Well, the end of the paragraph says this aspect of the invention is best exemplified in Figures 6A through 6C. Figure 6A says zero mils overdrive, meaning that point where you have essentially zero force. Column 15 of the patent talks about that being where there is no deflection absolutely whatsoever. All that means is that the tip comes down and I guess just barely touches. And that is, of course, the difference between their literally infringing design and their no-touch design. Now, why isn't this infinitesimally small distance between touching and not fully foreseeable? Meaning, why didn't you claim it in the first place that this is foreseeable? Well, Your Honor, while this has come up on appeal on the tangentialist requirement, we think that the actual exception we fall under, if ever there was a case for one, is the unfavorability exception. Is the what? The unforeseeability exception. Okay, and why not? And the reason why is because Rudolph's premise at trial, the reason for not infringing is because their device, their no-touch devices were revolutionary, patented, first generation, unique. I would have thought, I would have found in the record from your side to prove unforeseeability a declaration from an expert who said in 1993 it simply wasn't possible to take a picture down that close. Well, what we did is prove that. We're talking about technological impossibility or unforeseeability, right? Correct. I mean, that's like the Velcro example. The stuff doesn't exist, right? So, to carry your case, I would have expected the record to show an affidavit from somebody saying it simply wasn't possible in 1993 to take a picture down that close. Well, we proved that. We proved that through… No, but if it was possible to take a picture down that close, then why is it unforeseeable? Well, it's not possible. It was never thought to be possible to do that. In fact… Where's the record? Well, the record says that… Can you give me a cite? I can give you a number of cites. The record proves that they patented their version of no-touch. So, if it was patentable in 2003, it must have been unforeseeable back in 1995 when the amendment was made. Why? Because nobody got the patent earlier? Well, because nobody foresaw it earlier. Everything comes from old. It isn't foreseeable. It's just a matter of putting old things together to get inventions. True. That's how you create a whole thing. But what they patented was the idea of no-touch. What they said throughout all of their literature… Wait. Is there really an expert that testified that the only difference between their patent claims that they obtained and your patent claims are the infinitesimally small difference? Because I'm betting that their claims are written with different language. And if so, I'd like to see where the record establishes that they got a patent only on the infinitesimal difference between you and them. And I'm pretty sure the record doesn't say that. The record actually has in it a copy of their patent and the claim. And the claim includes that space. And unfortunately, it isn't in the record, but if the court would take judicial notice of the prosecution history, the only reason it was allowable is because of that space. And their expert testified that space is the whole key to their 3DOCM technology, the no-touch technology. And they say that throughout the record. We didn't have an expert come in and say that because we had proved it through all of their experts. In fact, their case below was to say we did not infringe under the doctrine of equivalence basically because our invention was unforeseeable. That's actually a clarifying question. Please, I'm sorry to interrupt you. Your time is going by quickly. I'm assuming that you waived your vitiation argument. No, Your Honor. Well, as your adversary points out, you didn't raise it in your brief. Well, I don't think that since we won below, I don't think we actually have to address all the arguments. Do you need to come up and lay down your argument so as to give your adversary an opportunity to respond in his favor? Well, we had done that below. And our argument on – the whole argument on prosecution… There's not a word in your brief about… We do reference what the district court said. And according to this court, under Deere v. Bushog… Well, you wouldn't be surprised if a panel concluded that you had waived it by not discussing it in your brief. I agree that we hadn't discussed it because we left out a footnote. But I wouldn't say we waived it because down below, we didn't have the burden of… I'd like to hear you say once again why you think the rationale of this amendment was tangential to a no-touch probe. Okay. I think the rationale is completely tangential because none of the prior art showed taking two images. And because what… What does that have to do with the rationale of the amendment? The rationale of the amendment, according to the objective rationale, according to the prosecution history, was to look at figures 6A through 6C to make it read on that, which is zero mils overdrive, which is to take an image at the beginning of scrub, first touch, and an image at the end, the overtravel. They admit they do that. They admit they do exactly that. Their expert says… But the purpose of the prosecution history is to put the public on notice. Correct. And we talked about the one at JA106-something. What about the statement at JA10815? That's the place where you're overcoming the obviousness rejection. And what you say is the claims of the present invention are directed towards predicting the movement or scrubbing action of the probe tips, and you have in bold… After contact. …after initial contact with the bonding pad. Correct. And so clearly… And this is your first statement about why the claims of the present invention are not obvious in light of these other… And you didn't bold take two images, which is what you're trying to suggest now is the rationale for the distinction between this and the prior art. You bolded after initial contact. So why isn't that putting the world on notice that you believe that the true novelty of your invention is that two images are taken after initial contact? Well, Your Honor, because it says the claims of the present invention are directed towards predicting the movement of the scrubbing action of the probe tips after contact, because that's the definition of scrub. In fact, Rudolph would not argue that they don't do this. It's predicting. A little later down in the very next paragraph, the first sentence of that next paragraph, in the context of the specific claim language, the speech for sites, the probe tip, is driven at two different forces or overdrives after contacting a window or deflection surface. So now it's not predictive. It's actual contact. Because that's the definition of scrub is because at that time, you have to look at the claim drafter in 1995. It was not known that you could do this in any other way. It was not known that you had no touch because they didn't come along and invent that until 2003. So if you look at Testo-3, especially the concurrence, they say it's very important to sit in the solid. That may be true, but all you did know, because the force can be zero, you did know all you're trying to do is to create a data point with this first touch or no touch. You're trying to create something that the computer can hold and say that's where it started. Because you're going to measure something, you want to measure the length starting from that first point. Correct. So what's the big deal about whether you're measuring it one way or the other? You just need to establish the point, right? Well, I guess I would say there is no big deal. What Judge Morris said is the file history seems to say that you make that initial point by making a contact. Well, because that was the definition in 1995. In fact, today a scrub is from the initial point of contact. In fact, all of Rudolph's manuals say they determined scrub as the point from initial or actual contact over travel. Back in 1995 when the amendment was… But the problem is you don't say let's determine a scrub from the point where there is going to be initial contact. The problem is the way in which you chose to distinguish your invention in order to overcome the prior art is you say let's take the picture after contact. And you bold it and you stress it on multiple occasions. And I guess, I think Mr. McDonald's argument as I understand it is you may not have had to give this up to get over SACO, for example, or even any of these others. But this was the way the patentee chose to distinguish his invention in order to get over those. And he thinks that you ought to be bound by it. So why not? Why don't we give in to that idea because it is consistent with the public notice? Well, because the public notice would have required the claim drafter to essentially be able to predict what they were going to do to understand for their technology to be foreseeable. If they didn't patent it until 2003, the claim drafter couldn't have said, well, somebody's going to come up with this eight, nine years later, which includes no touch. They say that's patentable. They say it's revolutionary. They say they're the first ones that have it. Their expert and Dr. Greenberg or Mr. Greenberg all say that that's what's different. That's the only thing that's different between what they do and what the claims say is they take that exact same image at first contact where it first touches right after contact, but they do it by predicting it just at that infinitesimal distance away. We couldn't have foreseen that because they didn't patent it until they spent $20 million to come up with it years later to have that no touch. And they talk about JA-12-569, talks about this being revolutionary, new technology, talks about it being patented, talks about specifically the no touch position is what's unique, what's patented, what's revolutionary. And then they say that same technology is what they then incorporate into their later devices, these PRVX-3s and 4s, the ones that they modify to make sure they don't touch. So it's not, you can't bound the claim drafter back in 1995 or see that eight years later, somebody's going to spend $20 million and come up with a way to do exactly the same thing. But at a infinitesimal distance away. What's this got to do with tangentiality? Sounds to me like you're arguing unforeseeability. Well, I'm arguing, I think unforeseeability and tangentialness kind of come together here because the reason it obviously is not tangential is nobody would have thought of it. We talk about making contact or taking that first image at contact or after initial contact because that was the understanding and the definition of the only way you could do that in 1995 when the amendment was written because that was the definition of scrub. Definition of scrub is, of course, taking that image at first contact, at actual first contact and afterwards. So what you're saying is the manner of how you go about taking your image, how you go about doing it was very much involved in the file history. That the rationale for the amendment was to describe how you go about creating the image? Yes, that you create a first image at that point that gives you the definition of scrub, that allows you to predict where that first contact would happen. So certainly making the contact point is not tangential to the rationale for the amendment. It's the heart of the rationale, right? You make the contact to make the image. Well, no, the heart of the amendment is getting what was seen in Figure 6A, which is that point of zero mils over travel, that point of imaginary first contact, where the purpose of the amendment was to take an image at the point of first scrub, to get scrub by two images, one where initial contact occurs because that was the definition of scrub and the second one at over travel because that's what made us different from the art. The art didn't teach contact or no contact. The whole purpose was to say that… Do you have a final thought for us, Mr. Campbell? Excuse me? Our time's expired. Do you have a final thought for us? My only last thought is that throughout their brief, the defendants argue that the doctrine of equivalence takes care of everything and it doesn't. The literal infringement findings and that verdict should still stand because even though they argue grain processing and whatnot, that isn't in the actual jury instructions. That's not in both of them. The first jury instruction is only on two supplier market. They argue that jury instruction is correct in page 19, footnote 4 of their reply brief. It doesn't include anything about non-infringing substitutes. It doesn't include anything about grain processing. And even the second argument, the Panduit jury instruction, says that the substantial non-infringing alternative must have been available at the time of first infringement. And it wasn't because it was invented in 2003. Thank you, Mr. Campbell. Thank you. Mr. McDonald? On the foreseeability issue, they rely on this purported revolutionary product and patent. I need to make very clear something. That has to do with the ProbeWorks product. All their arguments have to do with one of the two products found infringing under the doctrine of equivalence. It was revolutionary primarily because it used a 3D camera system to capture the location of these probe tips in what's called a fiducial plate. It's basically a glass with a bunch of little ruler-like marks on it. And by doing that, it eliminated the need to have that contact and, in fact, enhanced the speed of the device in many ways. If you look at those claims of the patent, you'll see that this issue of being spaced apart from the surface is really not what the invention is about. It's about the 3D cameras and the fiducial plate and how that allowed this system to work very quickly. And in this case, we've got a unique opportunity to see how that has nothing to do with foreseeability. The Honeywell v. Hamilton case talks about the issue isn't the foreseeability of the product. It's the equivalent. And we've got a perfect example of that in this case because of the other one, the other alleged equivalent. It was the redesigned PRVX that had already been using sometimes that no-contact first state. A very minor software change, as Your Honor was pointing out. What was it about this technology that you have a motor control, move it away from the tip a few microns? Absolutely, that was in capabilities at the time. Can you sum up your position on tangentiality, which for me is one of the cases that is going to get decided? Sure. They have two main reasons for that amendment. That's the first question under the tangentiality. It was to overcome the 112 rejection to show exactly what images were being captured. And to show that they were different from prior art, like on that 103 rejection, which had two images. But they had to show they were capturing two specific types of images that were different from the images that were called initial placement. That's how they contrasted the images in the prior art. Initial placement and non-overdriven. They were contrasting, not touching, but being driven in contact with a force. And I will mention, too, there is a 10657 in the file history where they talk about why are they doing that. And it's because when they mimic that scrub mark, they drive, in the first state, you still have to drive that tip into the surface of a real wafer to break through that aluminum oxide layer on the top of the bonding pad. That's a little non-conductive layer that just forms on top. You've got to break through that in step one to start the scrub mark. And then step two is you keep driving that tip into it to kind of dig in. The second probe? Pardon? You don't need to break through with the first touching because we know the first touching can be absolutely no force. Well, I'm talking about their invention, though. What they were telling the patent office was their invention, that they were mimicking the actual first state requiring not merely barely touching, but actually being driven and not breaking through the oxide. Where do you see on 10657 they talk about the first probe breaking the surface? Well, that's the page where they talk about it in an actual scrub mark. I've got an open 10657. I just didn't see a reference in there that the first probe is actually scratching. Yeah, it's talking about it. That's the page where they talk about it in a real wafer what's going on. Then you see in the other discussion we already had about these are both after initial contact in the actual claimed invention against the window. That's reproducing exactly what happens. Right, but the initial contact can be just like a feather. That's 6A, right? Yeah, but that won't mimic where the aluminum oxide layer is broken. Because then you need some more force to actually break through that layer. Yeah, but that's a first point. If you go back and you send your second probe in right on that point, scoop it, then you'll create your scratch, right? Well, the first point doesn't start the scrub mark in reality. That's what they were saying is you have some force and that's what they're trying to reproduce with their measurement system is the two forces, one to break the oxide and two to drive it in. Both forces are important to overcome to address the 112 indefiniteness issues. And those reasons go to the core of the equivalent because driven in contact with a force was required for both of those. They said it was required to overcome both the prior and the 112 rejections. We do not do any of those things. We don't drive it in contact with a force in our first state. So it's directly related, not tangential. Thank you, Mr. McDonald. Thank you. Our next case is Mori Microwave versus Focus Microwaves.